United States District Court For The Western District Of Pennsylvania

Charles Talbert

   v.         No. 1:23-cv-00260

Commonwealth of Pennsylvania, Josh Shapiro,

Department of Human Services, Philip Mader,   Susan P. Baxter

Philadelphia Court of Common Pleas,    U.S. District Judge

Department of Corrections, Laurel Harry,

Michael Wenerowicz, Michael Zaken, Brian    Richard A. Lanzillo

Schneider, Zachary Moslak, Cheryl Horner,   Chief U.S. Magistrate Judge

Lucas Malischak, Centurion of Pennsylvania,

John Wilson.

## Second Amended Complaint

Plaintiff Charles Talbert hereby files this civil action lawsuit pursuant to an inadequate system of mental health services within the adult criminal justice system in the Commonwealth of Pennsylvania.

RECEIVED

JUN 23 2025

CLERK-U.S. DISTRICT COURT
FOR THE WESTERN DISTRICT
OF PENNSYLVANIA

Parties:

1. Plaintiff is an adult individual and citizen of the United States.
2. Commonwealth of Pennsylvania (the State) is the State Government in Pennsylvania.
3. Josh Shapiro (Shapiro) is the Governor of the State.
4. Department of Human Services (DHS) is a State Agency.
5. Philip Mader (Mader) is the Director of DHS' Office of Mental Health and Substance Abuse Services.
6. Philadelphia Court of Common Pleas (the Court) is a State agency.
7. Department of Corrections (DOC) is a State agency.
8. Laurel Harry (Harry) is the DOC Secretary.
9. Michael Wenerowicz (Wenerowicz) is the DOC Executive Deputy Secretary for Institutional Operations.
10. Michael Zaken (Zaken) is a DOC Regional Deputy Secretary for the western region of Pennsylvania.
11. Brian Schneider (Schneider) is the DOC Director of Psychology.
12. Zachary Moslak (Moslak) is the DOC Chief Hearing Examiner.
13. Cheryl Horner (Horner) is the DOC Treatment Program Supervisor.
14. Lucas Malischak (Malischak) is the DOC Deputy Secretary for Office of Reentry.
15. Centurion of Pennsylvania (Centurion) is a Limited Liability Company.
16. John Wilson (Wilson) is Centurion's Vice President of Behavior Health Services.
17. Defendants are sued personally for monetary relief.

Facts:

18. Since 2019, the Defendants have participated in a widespread and long-standing practice, which has caused Plaintiff to be denied access to adequate mental health services, and housing in the most integrated setting appropriate to meet his individualized mental health needs.

19. This multilateral practice, aforementioned, has many interrelated features, including, but not limited to the following:

   A. A criminal justice system which has failed to take adequate and effective measures to meet the treatment needs of offenders.

   B. A criminal justice system which has failed to address the insufficient number of mental health facilities to meet the treatment needs of offenders.

   C. A criminal justice system which has failed to identify and differentiate criminal misconduct, and behavior that is squarely related to the symptoms of the offenders' mental illnesses.

   D. A criminal justice system that disproportionately punishes people of color due to the symptoms of their serious mental illnesses and/or symptoms that they develop while they are being punished.

20. The State Defendant, by and through its General Assembly, has enacted the Mental Health Procedures Act (MHPA), which governs mental health procedures in Pennsylvania and provides for treatment and rights of

mentally disabled persons. 50 PA. Stat. Section 7101 et seq.

21. Defendants DHS and Mader, pursuant to 62 PA. Cons. Stat. Section 1101, has a legal obligation to administer and enforce the MHPA, and all other laws and regulations relative to mental health.

22. However, despite the MHPA, and other laws and regulations, enacted and designed to govern the mental health procedures within the State of Pennsylvania, the State, DHS, and Mader has failed to administer and enforce these laws and/or regulations, adequately and effectively, within the States criminal justice system.

23. Plaintiff has a substantially long, documented history, of suffering from serious mental health conditions, that he requires care and adequate treatment for.

24. Pursuant to Section 7104 of the MHPA, the term "Adequate treatment" is defined as, most relevant here, the following :

   A. A course of treatment designed and administered to alleviate a person's pain and distress and to maximize the probability of his recovery from mental illness.

   B. diagnosis, evaluation, therapy, or rehabilitation needed to alleviate pain and distress and to facilitate the recovery of a person from mental illness.

   C. care and other services that supplement treatment and aid or promote such recovery.

25. The State, DHS, and Mader receives Federal funding to assist its legal obligation to assure the availability of adequate treatment to all persons who are mentally ill, such as the Plaintiff.

26. However, since 2019, the State, DHS, and Mader have deprived Plaintiff access to these treatment services, with the assistance of the other Defendants.

27. First, the State, DHS, and Mader has failed to take any reasonable measure to provide law enforcement officials proper guidance on how to identify and differentiate criminal misconduct, and behavior related to mental health symptoms, which has caused:

    A. individuals, such as Plaintiff, to be arrested, prosecuted, and sentenced to a term of imprisonment, for behavioral symptoms of their mental illness, instead of them being transported to a treatment facility in conformity with the MHPA, and/or, other laws that govern mental health procedures.

    B. the State's criminal justice system being over-populated with individuals, such as Plaintiff, suffering from serious mental health conditions, leading to insufficient resources to adequately address their mental illness in conformity with the MHPA and other laws that govern mental health procedures.

28. Second, despite the Court Defendant being a Federal fund recipient, in order to assist its administrative duty in connecting offenders to the treatment services they need in order to help reform their antisocial disorder behavior, the Court has failed to take reasonable measures to network with the State, DHS, and Mader to assure the availability of adequate mental health services to those being criminally sentenced for behavior related to their mental health conditions, which has caused:

A. individuals, such as Plaintiff, to be criminally sentenced to
a term of imprisonment for behavior related to their mental
illness, instead of committing them to a mental health insti-
tution in conformity with the MHPA and other laws that
govern mental health procedures.

B. individuals, such as Plaintiff, to have conditions of their crimi-
nal sentence, which includes the imposition of mental health
treatment while incarcerated, to not be effectuated in con-
formity with the MHPA and other laws that govern mental
health procedures.

29. Third, despite the DOC Defendant being a Federal fund recipient, in or-
der to assist its legal obligation of providing adequate mental
health treatment to those in its custody, such as Plaintiff, the DOC,
Harry, Wenerowicz, Zaken, Schneider, Moslak, Horner, Malischak, Centur-
ion, and Wilson Defendants, have individually, and collectively, failed
to take reasonable measures to assure the availability of adequate
mental health treatment in conformity with the MHPA and other
laws and regulations that govern mental health procedures.

30. Pursuant to 62 Pa. Cons. Stat. Section 1001, the State, DHS, and Mader, has
defined "mental health establishment" to mean "any premises or part
thereof, private or public, for the care of individuals who require care
because of mental illness..."

31. Pursuant to 55 Pa. Adm. Code Section 5320 et seq, the DOC is required to
receive a license from the State, DHS, and Mader, for the operation of
a mental health establishment.

32. However, despite the large percentage of individuals, such as Plaintiff,

with serious mental health conditions within the custody of the
DOC, the DOC has only licensed the mental health unit at SCI
Waymart as a mental health establishment, which has
caused:

    A. individuals, such as Plaintiff, with serious mental illness,
      to be misplaced and housed in non-therapeutic facilities.

    B. individuals, such as Plaintiff, to be denied equal access to
      adequate treatment facilities as others similarily situated,
      and thus, leaving them deprived of adequate treatment that
      conforms to the MHPA and other laws that govern mental
      health procedures.

33. In addition to the inadequacy of mental health facilities licensed by the
State, DHS, and Mader, the DOC has also established a widespread and
long-standing practice of punishing individuals, such as Plaintiff,
with solitary confinement, for behavior related to their mental health
disorders.

34. As a part of this aforesaid practice of punishing individuals for their
mental health behavioral symptoms:

    A. the DOC has disproportionately isolated inmates of color in soli-
      tary confinement for psychotic behavior, while also keeping them
      there for developing behavioral symptoms caused from known
      psychological effects of prolonged social isolation.

    B. Defendant Moslak has knowingly and recklessly approved of inmates
      with serious mental illness, such as Plaintiff, to be isolated in
      prolonged solitary confinement for behavior related to their
      mental health conditions.

C. Schneider has knowingly and recklessly directed mental health staff to provide inadequate mental health services to inmates, such as Plaintiff, that are housed in solitary confinement, with sufficient knowledge that it is effectively impossible for individuals in solitary confinement to receive adequate treatment in conformity with the MHPA and other laws that govern mental health procedures.

D. Wenerowicz, Zaken, Horner, Malischak, and Harry, have knowingly and recklessly decided to keep Plaintiff isolated in solitary confinement, indefinitely, despite Plaintiff having a controlling maximum sentence date for November 12, 2025.

E. Centurion and Wilson have established and maintained a widespread and long-standing practice of :

(i) Allowing its psychiatric staff members to misdiagnose inmates, such as Plaintiff, while they are housed in solitary confinement.

(ii) Allowing its psychiatric staff members to deprive inmates, such as Plaintiff, of adequate medication for their serious mental illness, while they are housed in solitary confinement.

35. Moreover, despite Defendant Shapiro receiving sufficient notice of Plaintiff suffering from serious psychological harm caused from him being isolated in prolonged solitary confinement, and Shapiro having a statutory and constitutional duty to faithfully enforce State law(s) that govern mental health procedures in Pennsylvania, Shapiro has failed to take any reasonable measure within his

power and authority to assure the availability of adequate mental health services, and housing, for Plaintiff in conformity with the MHPA and other State laws that govern mental health procedures.

36. As a proximate result of Defendants' aforesaid acts and inactions:

A. Plaintiff was arrested, prosecuted, and sentenced to a term of imprisonment for behavior related to his mental health conditions.

B. Plaintiff was misdiagnosed and deprived of adequate medication to treat his anxiety, paranoia, depression, bipolar, and his personality disorders.

C. Plaintiff was deprived of adequate housing and treatment.

D. Plaintiff was placed and kept in solitary confinement for five and a half consecutive years for psychotic behavior, and behavior caused from the psychological effects of prolonged social isolation.

E. Plaintiff's mental health symptoms have gotten worse.

F. Plaintiff has and continues to suffer from psychological harm and trauma and will have to pay out-of-pocket medical fees when released from DOC custody in order for specialists to cure his mental trauma caused from prolonged social isolation.

Causes of Action:

Count One - Americans with Disabilities Act (ADA) Violations

37. As aforementioned, Plaintiff has a long, documented history of suffering from several mental disorders, and because of this disability, he is qualified to receive the services of the State, DHS, the Court, and DOC, relative to mental health, in conformity with the MHPA and other laws/regulations that govern mental health procedures in Pennsylvania.

38. However, in between 2019 and 2025:

A. the State and DHS has caused Plaintiff to be arrested, prosecuted, and criminally sentenced for behavior related to his mental disorders, by failing to provide law enforcement officials proper guidance on how to identify and differentiate criminal behavior and behavior related to mental illness.

B. the State, DHS, and the Court has caused Plaintiff to be criminally sentenced to a term of imprisonment, rather than committing him to a mental health facility, for behavior related to his mental disorder.

C. the State, DHS, and the DOC has caused Plaintiff to be socially isolated in solitary confinement for 5½ consecutive years for behavior related to his mental disorder, by them only having one licensed mental health facility, which has ultimately, and inevitably, caused mass misplacement of inmates who require mental health services in conformity with the MHPA and other laws/regulations that govern mental health procedures.

WHEREFORE, Plaintiff demands judgment against the State, DHS, the Court, and the DOC in an amount in excess of $1 million, costs, and fees.

Count Two: Rehabilitation Act (RA) Violations

39. As aforementioned, the State, DHS, the Court, and the DOC are all Federal fund recipients, however, in between 2019 and 2025:

A. Plaintiff was subjected to discrimination by the State and DHS by causing him to be arrested, prosecuted, and criminally sentenced for behavior related to his mental disorders, by failing to provide law enforcement officials proper guidance on how to identify and differentiate criminal behavior and behavior related to mental illness.

B. Plaintiff was subjected to discrimination by the State, DHS, and the Court by causing him to be criminally sentenced, rather than committing him to a mental health facility, for behavior related to his mental disorder.

C. Plaintiff was subjected to discrimination by the State, DHS, and DOC, and denied housing in the most integrated setting appropriate to treat his serious mental health conditions, by causing him to be socially isolated in solitary confinement for 5½ consecutive years for behavior that's related to his mental illness, as a result of them having only one (1) licensed mental health facility, which has ultimately, and inevitably, led to mass displacement of inmates who require mental health services in conformity with the MHPA and other laws/regulations that govern mental health procedures.

WHEREFORE, Plaintiff demands judgment against the State, DHS, the Court, and DOC, in an amount in excess of $1,000,000.00, costs, and fees.

Count Three · Civil Rights Act of 1964 Violation

40. As aforementioned, the DOC has subjected Plaintiff to discrimination, based on his color and/or race, by and through its widespread and long-standing practice of punishing inmates who are of color, with solitary confinement, disproportionately than their White counterpart, as a result of their behavior related to their mental illness, and/or, as a result of psychotic behavior that has developed as a result of being socially isolated for such long periods of time.

41. By reason of this aforesaid practice being maintained since 2019, and the DOC being a Federal fund recipient, it is evident that:

   A. the facially neutral practice of using solitary confinement as a punishment, has resulted in a racial disparity.

   B. the DOC has willfully and maliciously caused and perpetuated racial segregation within its solitary confinement units.

WHEREFORE, Plaintiff demands judgment against the DOC in an amount in excess of $1,000,000.00, punitive damages, costs, and fees.


Count Four · Eighth Amendment · Deliberate Indifference

42. As aforementioned, Plaintiff has serious mental health conditions, however, in between 2019 and 2025:

   A. Mader has caused Plaintiff to be subjected to cruel and unusual punishment by reason of Mader: (i) failing to provide law enforcement officials proper guidance on how to identify and differentiate criminal behavior and behavior resulting from mental illness which has caused

Plaintiff to be subjected to arrests, prosecutions, and sentences based on behavior related to his mental illness; (ii) failing to have in place an adequate and effective process for screening sentencing conditions, which has led Plaintiff to be denied access to the treatment in which the Court had conditioned his State sentence to receive; and (iii) failing to license more than one mental health facility within the DOC, which has caused Plaintiff to be misplaced and punished with solitary confinement for behavior related to his serious mental health conditions.

B. Moslak has caused Plaintiff to be subjected to cruel and unusual punishment by knowingly and recklessly allowing inmates with serious mental health conditions, such as Plaintiff, to be punished with solitary confinement for behavior related to mental illness, and failing to have a process for individuals with mental illness to have separate hearings to conform to their mental health needs.

C. Schneider has caused Plaintiff to be deprived access to adequate mental health services by reason of Schneider: (i) directing mental health staff to deny inmates in solitary confinement access to treatment services in conformity with the MHPA; and (ii) directing a mental health program that he knows vulnerable inmates with serious mental health conditions in solitary confinement can't receive any adequate and effective benefit from while they are housed in that socially isolated confinement.

D. Wenerowicz, Zaken, Horner, Malischak, and Harry have caused Plaintiff to be subjected to cruel and unusual punishment by keeping him in solitary confinement, indefinitely, for behavior related to his mental illness.

E. Centurion and Wilson, as final decision-makers of behavior health services for the DOC, has been deliberately indifferent to Plaintiffs serious mental health needs, by and through a widespread and long-standing practice of: (i) directing a psychiatric program which misdiagnoses inmates in solitary confinement; (ii) directing a psychiatric program which maintains inaccurate mental health records for inmates in solitary confinement; (iii) directing a psychiatric program which deprives inmates of adequate and effective medication, such as Xanax, for their serious mental health conditions while in solitary confinement; and (iv) directing a psychiatric program that priortizes profit over the mental health of inmates in solitary confinement by denying them adequate services and using costs as a motivating factor to prescribe inadequate, ineffective, and inexpensive medication.

E. Shapiro has been deliberately indifferent to Plaintiffs serious mental health condition, by receiving a letter from Plaintiff regarding him suffering from psychological torture while in prolonged social isolation, and Shapiro taking no reasonable measure(s) to have Plaintiff removed from such untherapeutic environment and placed into housing in conformity with the MHPA and other laws that govern mental health procedures.

WHEREFORE, Plaintiff demands judgment against Shapiro, Mader, Harry, Wenerowicz, Zaken, Schneider, Moslak, Horner, Malischak, Centurion, and Wilson in an amount in excess of $1,000,000.00, punitive damages, costs, and fees.

Count Five: Fourteenth Amendment: Due Process Violations

43. As aforementioned, as an individual with serious mental health needs, the Plaintiff is entitled to receive adequate mental health treatment in conformity with the MHPA and other laws/regulations that govern mental health procedures in Pennsylvania.

44. However, Shapiro, Mader, Harry, Wenerowicz, Zaken, Schneider, Moslak, Horner, Malischak, Centurion, and Wilson, by and through their aforesaid acts and inactions, have deprived Plaintiff of this protected liberty interest, and instead, engaged in the aforementioned unfair, arbitrary, and irrational conduct that has caused Plaintiff the aforesaid harm.

WHEREFORE, Plaintiff demands judgment against Shapiro, Mader, Harry, Wenerowicz, Zaken, Schneider, Moslak, Horner, Malischak, Centurion, and Wilson in an amount in excess of $1,000,000.00, punitive damages, costs, and fees.

Count Six: Fourteenth Amendment: Equal Protection Violations

45. As aforementioned, but for the actions and inactions of Shapiro, Mader, Harry, Wenerowicz, Zaken, Schneider, Moslak, Horner, Malischak, Centurion, and Wilson, Plaintiff was denied equal access to mental health services that conform to the MHPA and other laws that govern mental health procedures in Pennsylvania.

WHEREFORE, Plaintiff demands judgment against Shapiro, Mader, Harry, Wenerowicz, Zaken, Schneider, Moslak, Horner, Malischak, Centurion, and Wilson in an amount in excess of $1,000,000.00, punitive damages, costs, and fees.

Prayer For Relief :

WHEREFORE, Plaintiff respectfully requests for this Honorable Court
to grant all relief mentioned herein against Defendants, jointly
And severally, And any other relief in which this Court finds to be
Approprinte and equitable.
                        In addition, Plaintiff demands a trial, if
necessary, before the Bench, And appointment of Trial Counsel.

Verification :

I hereby verify under penalty of perjury that the foregoing facts
Are true and correct to the best of my knowledge, information,
And belief.

                              Respectfully submitted,

SCI Phoenix - QAY727            Charles Talbert - Paralegal
1200 Mokychic Drive
Collegeville, PA, 19426              June 12, 2025

Appendix of Exhibits:

1. Sentencing Transcript
2. Order of Sentence.
3. Sentence Status Summary
4. Program Review Committee Action Attachment
5. Grievance History No. 1129745
6. NAMI Public Policy on Solitary Confinement
7. Letter To Regional Licensed Program Manager with Domestic Return Receipt
8. Communication with Regional Deputy Secretary with Domestic Return Receipt
9. Communication with Executive Deputy Secretary
10. General Appropriation Act of 2024

# First Judicial District of Pennsylvania

*51CR00083482018*
*Charles Talbert*

*Sentencing Volume 1*
*December 18, 2019*



*First Judicial District of Pennsylvania*
*100 South Broad Street, Second Floor*
*Philadelphia, PA 19110*
*(215) 683-8000   FAX:(215) 683-8005*

Original File CHARLES*TALBERT*W'12-18-19.txt,-0 Pages
CRS Catalog ID: 19120935

51CR00083482018
Charles Talbert

Sentencing Volume 1
December 18, 2019

Page 5

[1] REAP, it would be three. Offense gravity
[2] score of three.
[3]         THE COURT: And the guideline
[4] ranges would be?
[5]         MS. DAWSON-MURRAY: Twelve to
[6] eighteen, boot camp, plus or minus three.
[7]         THE COURT: All right.
[8]         Let me hear from defense
[9] counsel your recommendation.
[10]        MR. COOPER: Yes, Your Honor.
[11] Based on reading the mental
[12] health evaluation and the presentence report,
[13] knowing about the facts of the case, it's
[14] clear that Mr. Talbert needs treatment, dual
[15] diagnosis treatment. It's our request that he
[16] be sentenced to county time with parole to
[17] inpatient treatment, dual diagnosis when a bed
[18] is ready.
[19]        THE COURT: Okay.
[20]        Ms. Dawson-Murray.
[21]        MS. DAWSON-MURRAY: Yes, Your
[22] Honor.
[23]        In this case, Your Honor, the
[24] Commonwealth, recognizing that the cost of
[25] incarceration is approximately $42,700 per

Page 6

[1] year, and recognizing that this defendant is,
[2] in fact, in need of inpatient treatment, the
[3] recommendation would be for 11 and a half to
[4] 23, on the REAP charge, with a consecutive
[5] two-year probation on the PIC charge.
[6]         Your Honor, I would ask that he
[7] be immediately paroled if -- if and when a bed
[8] is available for that inpatient treatment. I
[9] do believe that he would have to get a FIR
[10] evaluation for that dual diagnosis treatment.
[11] I would ask that he be
[12] supervised by the Mental Health Unit. He be
[13] subjected to frequent drug screens. He
[14] participate in counseling. He work with an
[15] advocate, of some kind, to find housing. He
[16] take anger management treatment. He find and
[17] maintain employment. Or if he wants to seek
[18] additional education, he can do that.
[19]         Additionally, Your Honor, I
[20] would ask that a stay-away order be ordered in
[21] this case. I don't believe that he has any
[22] knowledge of where the victims are, but I just
[23] would -- to cover my basis, Your Honor, I
[24] would ask for a stay-away order.
[25]         Additionally, Your Honor, it

Page 7

[1] does look like the mental health evaluation
[2] suggested that active involvement in a
[3] treatment community of some kind may be
[4] beneficial for long term -- for his long term
[5] wellness, as well as extended psychological
[6] treatment and counseling. So I would just ask
[7] that that be done after his inpatient is
[8] served.
[9]         THE COURT: Okay.
[10]        And, Mr. Talbert, it's your
[11] turn to speak if you wish.
[12]        THE DEFENDANT: First --
[13] first -- first, I want to apologize to you for
[14] my behavior during trial. I was just -- I
[15] really felt like I was not being treated fair,
[16] not being able to speak. And that's the
[17] reason why I came off as I did, but, as a man,
[18] I apologize.
[18]        I got a 90-year-old grandmother
[20] out there that raised me. And that I don't
[21] know if she's going to make it or not and I
[22] want to get a chance to see her again, if it's
[23] possible.--
[24]        In January, I was enrolled in
[25] Community College right before I got locked up

Page 8

[1] on these charges. I wanted to pursue my law
[2] degree. I know I got -- I have mental health
[3] issues. I've been diagnosed with paranoid
[4] schizophrenia. I got shot multiple --
[5] multiple bullets in 2011. I got my colon
[6] removed behind that. I had injury to my
[7] bladder.
[8]         I suffer from extreme anxiety.
[9] I got a lot of medical issues that's not being
[10] treated while I'm in prison. And it's a lot
[11] of legal issues between medical, dental at the
[12] prison behind lack of treatment.
[13]        I really need a program to help
[14] me balance myself out. And therapy will
[15] help. I had been off my medication since I
[16] been locked up. Like I explained to you
[17] before, they won't give me the medication that
[18] I ask for. The medication they gave me before
[19] injured my heart called Pamelor.
[20]        It's a medication they did a
[21] bridge order on. And after two weeks of
[22] taking the medication, it caused me to have a
[23] heart condition, abnormal heart condition.
[24] And it's issues beyond that, too.
[25]        But like this case right here,

5104853  vo 33 of 59 for CHARLES TALBERT

51CR00083482018
Charles Talbert

Page 13

[1] with this defendant's ability to participate
[2] in a sentencing hearing, which means he's
[3] competent to proceed with this hearing -- to
[4] this sentencing hearing.
[5]     He readily acknowledges that
[6] his court demeanor was willful behavior. That
[7] he euphemizes as part of legal strategy, but
[8] it's more likely the product of his
[9] personality difficulties that include poor
[10] impulse control, poor judgment, and lack of
[11] insight into the underlying nature of his
[12] psychological conflicts and symptoms.
[13]     Based on the current interview,
[14] when this defendant is released into the
[15] community, he should be directly admitted into
[16] inpatient dual diagnosis treatment program to
[17] begin to address his complex clinical
[18] picture. He will likely need additional
[19] treatment after completing such a program to
[20] fully address his trauma symptoms and his
[21] deeper personality conflicts.
[22]     He should be supervised by the
[23] Mental Health Unit of the probation department
[24] when in the community and should be under
[25] strict supervision and receive urine drug

Page 14

[1] scenes on a consistent basis to monitor his
[2] abstinence, poor internalized controls, and
[3] any mood-altering substances could result in
[4] disinhibition and further loss of judgment.
[5]     Based on his clinical picture
[6] and criminal history, his prognosis for
[7] remaining out of future legal difficulties is
[8] poor. However, if he can persist in
[9] treatment, he can make progress because he's
[10] extremely bright and this would tend to
[11] improve the prognosis.
[12]     The standard range in the
[13] guidelines for the PIC charge requires and
[14] calls for a state sentence, not a mitigated
[15] sentence, which would be the county sentence.
[16]     All right. I'm going to
[17] sentence as follows: On the charge of PIC,
[18] the sentence is 29 to 60 months on the PIC
[19] charge, with credit for time served on this
[20] case if applicable.
[21]     This sentence is in the
[22] standard range of the guidelines. This
[23] sentence will run concurrent (sic) to any
[24] other sentence he's currently serving, because
[25] he has a long criminal history. I don't know

Page 15

[1] whether he's serving something else, but it
[2] will run consecutive to that.
[3]     On the charge of recklessly
[4] endangering another person, it's one to two
[5] years in state prison to run consecutive to
[6] the 29 to 60 months on the PIC.
[7]     So the aggregate sentence is
[8] three and a half to seven years
[9] approximately.
[10]     I'm going the recommend SCI
[11] Waymart for the defendant to get mental health
[12] and drug treatment. And, perhaps because
[13] this facility specializes in housing people
[14] with mental health disorders, they will have
[15] the medication that Defendant is seeking for
[16] his conditions.
[17]     As a further condition of the
[18] sentence, defendant is to complete anger
[19] management treatment along with drug and
[20] mental health treatment, undergo random
[21] urinalysis upon release, seek and maintain
[22] employment, complete job training, and I'm
[23] issuing a stay-away order of both victims.
[24]     While Defendant is -- claims
[25] that the victims were put up to pointing him

Page 16

[1] out as the person who did something to them,
[2] both of the victims indicated they were
[3] originally from, I think, Sierra Leone or a
[4] French-speaking county. And they just
[5] happened to have broken down on the road and
[6] they asked this defendant for help. And in
[7] response to them asking -- on the street. Their car broke down. He
[8] on the street. Their car broke down. He
[9] decides to do what the Commonwealth charged
[10] him with, aggravated assault
[11]     The defendant was charged with
[12] two counts of aggravated assault with a deadly
[13] weapon. However, he was found guilty on the
[14] possession of an instrument of crime and
[15] recklessly endangering another person so ...
[16]     The defendant is not RRRI
[17] eligible and I'm imposing the mandatory court
[18] costs.
[19]     Do you have any question about
[20] your sentence?
[21]     MR. COOPER: Your Honor, I have
[22] a question about the sentence.
[23]     You are ordering, upon release,
[24] some conditions.
[25]     THE COURT: Yes.

← not guilty of (bias)

:: 5104853 pg 34 of 59 for CHARLES TALBERT

Case 1:23-cv-00260-SPB-RAL   Document 229   Filed 07/08/25   Page 21 of 41
Case 2:23-cv-02262-MAK   Document 14   Filed 07/26/23   Page 52 of 84
Case 3:23-cv-00410-MEM-DB   Document 23-1   Filed 07/07/23   Page 7 of 8

Commonwealth of Pennsylvania
v.
Charles Talbert

IN THE COURT OF COMMON PLEAS OF
PHILADELPHIA COUNTY, PENNSYLVANIA

CRIMINAL DIVISION

DOCKET NO: CP-51-CR-0008348-2018
DATE OF ARREST: 09/29/2018
OTN: U 139241-4
SID: 243-95-32-4
DOB: 03/27/1981
PID: 0810247

# ORDER OF SENTENCE

AND NOW, this 18th day of December, 2019, the defendant having been convicted in the above-captioned case is hereby sentenced by this Court as follows:

**Count 2 - 18 § 907 §§ A - Poss Instrument Of Crime W/Int (M1)**
To be confined for a minimum period of 29 Month(s) and a maximum period of 60 Month(s) at State Correctional Institution.
The following conditions are imposed:
Other: Sentence imposed of 29-60months incarceration as to 907, 1-2years consecutive incarceration as to2705. Credit for time served if applicable on this case. Sentence is consecutive to any other sentence being served. Not RRRI eligible. Court recommends SCI Waymart for mental health and drug treatment. While incarcerated defendant to have anger management, drug and mental health treatement, job training. Upon release defendant to continue mental health and drug treatment, random urinalysis, seek and maintain employment, stay away from both victims. This sentence shall commence on 12/18/2019.

**Count 4 - 18 § 2705 - Recklessly Endangering Another Person (M2)**
To be confined for a minimum period of 1 Year(s) and a maximum period of 2 Year(s) at State Correctional Institution.
This sentence shall commence on 12/18/2019.

LINKED SENTENCES:
Link 1
CP-51-CR-0008348-2018 - Seq. No. 4 (18 § 2705 §§) - Confinement is Consecutive to
CP-51-CR-0008348-2018 - Seq. No. 2 (18 § 907 §§ A) - Confinement

The defendant shall pay the following:

| | Fines | Costs | Restitution | Crime Victim's Compensation Fund | Total Due |
|---|---|---|---|---|---|
| Amount: | $0.00 | $387.25 | $0.00 | $60.00 | $447.25 |
| Balance Due: | $0.00 | $387.25 | $0.00 | $60.00 | |

ADA: J. Davison-Murray DEF ATTY: B. Cooper
STENO: O. Taylor COURT CLERK: J. Scott
JUDGE: GENECE BRINKLEY



Case 1:23-cv-00260-SPB-RAL    Document 229    Filed 07/08/25    Page 22 of 41
Case 2:23-cv-02262-MAK    Document 14    Filed 07/26/23    Page 53 of 84
Case 3:23-cv-00410-MEM-DB    Document 23-1    Filed 07/07/23    Page 8 of 8

Commonwealth of Pennsylvania

**Order of Sentence**

v.

**Charles Talbert**

Docket No: CP-51-CR-0008348-2018

BY THE COURT:

_____

Judge Genece E. Brinkley



# COMMONWEALTH OF PENNSYLVANIA
## DC16E – SENTENCE STATUS SUMMARY       DEPARTMENT OF COR

Created By: Flynn, Maria, Central Office, 09/23/2024 10:04 AM

## 1. Identification

| DOC # | Name | PPB # | Phila Photo # | DOB |
|-------|------|-------|---------------|-----|
| QA4727 | TALBERT, CHARLES | 314EU | 810247 | |

## 2. Remarks

| Remarks Content |
|-----------------|
| ADMINISTRATIVE CHANGE, ADJUST CREDIT; Credit added at CP8348-2018 per credit memo dated 12/19/2019. |

## 3. Indictments

*Regarding RRRI Cases: The Minimum in the section below does not include any RRRI calculations. If any of the indictments below are designated as RRRI, please refer to Sentence Structure section to view RRRI minimum dates for the sentence.

| Sentence Date | Start Date | Jurisdiction | Docket Number | Count | | Minimum | | | | | Maximum | | |
|---------------|-----------|--------------|---------------|-------|---|---------|---|---|----|---|---------|---|----|
| | | | | | Y | M | D | LD | Y | M | D | LD |
| 12/18/2019 | | Philadelphia | CP-51-CR-0008348-2018 | 2 | 0 | 29 | 0 | 0 | 0 | 60 | 0 | 0 |

| Sentence Relationship | RRRI Indicator | Disposition | OTN | Judge |
|-----------------------|----------------|-------------|-----|-------|
| CC | | Guilty | U1392414 | Brinkley, Genece E. |

| Status | | Commitment Type | STATE |
|--------|--|-----------------|-------|

| Offense | 18.907.A-Poss Instrument Of Crime W/Int-M1 |
|---------|---------------------------------------------|
| Adjustment | Commitment Credit - 01/10/2019 - 12/18/2019 |
| Adjustment | Commitment Credit - 09/29/2018 - 11/26/2018 |

| Sentence Date | Start Date | Jurisdiction | Docket Number | Count | | Minimum | | | | | Maximum | | |
|---------------|-----------|--------------|---------------|-------|---|---------|---|---|----|---|---------|---|----|
| | | | | | Y | M | D | LD | Y | M | D | LD |
| 12/18/2019 | | Philadelphia | CP-51-CR-0008348-2018 | 4 | 1 | 0 | 0 | 0 | 2 | 0 | 0 | 0 |

| Sentence Relationship | RRRI Indicator | Disposition | OTN | Judge |
|-----------------------|----------------|-------------|-----|-------|
| CS | | Guilty | U1392414 | Brinkley, Genece E. |

| Status | | Commitment Type | STATE |
|--------|--|-----------------|-------|

| Offense | 18.2705-Recklessly Endangering Another Person-M2 |
|---------|---------------------------------------------------|
| Adjustment | Commitment Credit - 01/10/2019 - 12/18/2019 |
| Adjustment | Commitment Credit - 09/29/2018 - 11/26/2018 |

## 4. Sentence Summary

| Controlling Minimum Date | RRRI Minimum Expiry Date | True Minimum Expiry Date | Controlling Maximum Date | New Maximum PV | Continued from DOC Number |
|--------------------------|--------------------------|--------------------------|--------------------------|----------------|---------------------------|
| 04/12/2022 | | | 11/12/2025 | | |

5496230 pg 43 of 57 for CHARLES TALBERT

| Program Review Committee Action Attachment | COMMONWEALTH OF PENNSYLVANIA Department of Corrections |
|---|---|

☐ Misconduct Appeal   ☐ Periodic Review   ☑ Other

| DC Number | Name | Facility | Date of Review | No. from Part 1 |
|---|---|---|---|---|
| QA-4727 | Talbot | PHX | 1 6 20 | |

Inmate was placed in
the P.O.C. for aggressive
& erratic behavior. Inmate
has since stabilized &
has been discharged
back to P bloc
per Dr. Glushakow.

| Names of Program Review Committee Members | Signatures | Date |
|---|---|---|
| R. Laborne | | 1 6 20 |
| Adam Glushakow, MD | | 1 6 21 |
| M. Sipple | | |

cc:   DC-15
      Unit Managers
      Inmate

*Violation of*

DC-804
Part 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

FOR OFFICIAL USE
1129-9615
GRIEVANCE NUMBER

**OFFICIAL INMATE GRIEVANCE** *The 13.8.1 Policy*

| TO: FACILITY GRIEVANCE COORDINATOR | FACILITY: FYT | DATE: 1-28-25 |
|---|---|---|

FROM: (INMATE NAME & NUMBER)
TALBERT - QA4727

SIGNATURE OF INMATE:

WORK ASSIGNMENT:
in re: CP-51-CR-8348-2018

HOUSING ASSIGNMENT:
Z-A-1010

INSTRUCTIONS:
1. Refer to the DC-ADM 804 for procedures on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. List in Block B any action you may have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Provide a brief, clear statement of your grievance. Additional paper may be used, maximum two pages (one DC-804 form and one one-sided 8½" x 11" page). State all relief that you are seeking.

Today on January 28, 2025, I showed Dr. Saavedra the order of my state sentence which ordered for me to receive mental health treatment while incarcerated, and for me to receive that treatment at SCI Waymart. I also informed him of me being isolated in solitary confinement under DC status for over 5 consecutive years to which was causing my mental health to become worse (i.e. severe paranoia and anxiety). I requested to be referred by him to PRC for a recommendation, pursuant to the 13.8.1 Policy, to be removed from this form of isolation due to my mental health grossly deteriorating. He stated that he will not make that recommendation, and stated that PRC would not listen to him even if he did. I request to be moved to long-term AC so that I can obtain therapeutic items for my mental health.

B. List actions taken and staff you have contacted, before submitting this grievance.
I tried to resolve this issue with PSS Graff and Dr. Saavedra. Section 2.E.1.9.(a) of the 13.8.1 Policy provides, in part: "the treating psychiatrist/CRNP shall ... make recommendations to the PRC regarding individuals in DC status who may be released". Dr. Saavedra refused to acknowledge this Section of the 13.8.1.

Your grievance has been received and will be processed in accordance with DC-ADM 804.

Signature of Facility Grievance Coordinator

Date  1-29-25

WHITE Facility Grievance Coordinator Copy    CANARY File Copy    PINK Action Return Copy
GOLDEN ROD Inmate Copy

**SCI FAYETTE**

JAN 29 2025

*DC-ADM 804, Inmate Grievance System Procedures Manual*
**Section 1 – Grievances & Initial Review**
Issued: 1/26/2016
Effective: 2/16/2016

SUPERINTENDENTS ASSISTANT
*Attachment 1-A*

Charles Talbert    Final Grievance Appeal
No. QA4727    No. 1129745
SCI Fayette    February 27, 2025

Pursuant to Section 7109 of the Mental Health Procedures Act, the term "Adequate treatment" means "a course of treatment designed and administered to alleviate a person's pain and distress and to maximize the probability of his recovery from mental illness." The dilemma here, as DC status in solitary confinement is concerned, is that "it is well established in both case law and scientific and medical research that prolonged solitary confinement poses a substantial risk of serious psychological and physical harm." Porter v. PA DOC, 974 F.3d 431 (3rd 2020), Williams v. Wetzel, 848 F.3d 549 (3rd 2017). Moreover, "maximum penalties are excessive and not rationally related to improving prisoner behavior because research has shown that disciplinary sanctions of up to a year, or longer, have no relationship to effective modification of behavior and are not an effective deterrent." Davis v. Baldwin, 2021 US Dist LEXIS 110558 (S.D.Ill. June 14, 2021)(both correctional and psychological experts).

As such, I been housed in solitary confinement for more than 5 consecutive years under DC status, with a max date Nov. 12, 2025. If I were in long-term AC I could buy therapeutic items to help my mental health and eat better.
e.c.c file



## Grievance Referral (Notice to Inmate)

Secretary's Office of Inmate Grievances & Appeals
Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050

04/28/2025 03:03

| Inmate Name: | TALBERT, CHARLES | DOC #: | QA4727 LA12 |
|---|---|---|---|
| SCI Filed: | Fayette | Current SCI: | Fayette |
| Grievance #: | 1129745 | | |

This serves to acknowledge receipt of your appeal to the Secretary's Office of Inmate Grievances and Appeals for the grievance noted above. In accordance with the provisions of DC-ADM 804, "Inmate Grievance System Policy", the following response is being provided based on a review of the entire record of this grievance. The review included your initial grievance, the Notice of Incoming Publication Denial Form, your appeal to the Facility Manager, the Facility Manager's response, the issues you raised to final review, and (when applicable) any revised institutional responses required as a result of a subsequent remand action by this office. As necessary, input from appropriate Central Office Bureaus (e.g., Health Care Services, Chief Counsel, Office of Special Investigations and Intelligence, etc) may have been solicited in making a determination in response to your issue as well.

### Action: Referral

**Bureau/Office:**

- Psychology Office - Referral Date : 04/28/2025

| Signature: | Keri Moore |
|---|---|
| Name: | K. Moore |
| Title: | Assistant Chief Grievance Officer |
| Date: | 04/28/25 |

cc:  DC-15/Superintendent - Fayette
Grievance Office

---

**DC-ADM 804, Inmate Grievance System Procedures Manual**

Section 2 - Appeals, Attachment 2-F

Issued: 1/26/2016  Effective: 2/16/2016

QA4727    Grievance #:        1129745

TALBERT, CHARLES

# Solitary Confinement
## NAMI Public Policy Position



nami
National Alliance on Mental Illness

## Where We Stand:

NAMI believes that no one should be subject to practices that can cause or worsen mental health symptoms. NAMI opposes the use of solitary confinement and equivalent forms of administrative segregation for people with mental health conditions.

## Why We Care:

Solitary confinement is the placement of individuals in locked, highly restrictive and isolated cells or similar areas of confinement with limited or no human contact and few, if any, rehabilitative services. Placement in solitary confinement frequently lasts for weeks, months or even years at a time.

NAMI opposes the use of solitary confinement and equivalent forms of administrative segregation for people with mental health conditions.

It is routinely documented that solitary confinement is used extensively in correctional settings for people with severe psychiatric symptoms. A 2018 national report documented that about 8.6% of all individuals held in segregated settings are diagnosed with serious mental illness.

Solitary confinement for people with serious mental illness:

- Causes extreme suffering

- Disrupts treatment

- Causes or worsens symptoms such as depression, anxiety, and hallucinations

- Impedes rehabilitation, recovery and community re-integration

- Causes adverse long-term consequences for cognitive and adaptive functioning

Rather than using isolation strategies that can cause long-term damage, NAMI urges federal, state and other correctional authorities to provide mental health care alternatives to solitary confinement.

To learn more about NAMI's work on this issue, visit www.nami.org/Advocacy/Policy-Priorities



Charles Talbert                    Tr.No.: 9590 9402 7131 1251 9694 70
No. QA4727                         Art.No.: 7021 2720 0001 9126 9005
SCI Fayette
SMU Program
PO BOX 33028
St. Petersburg. Fl. 33733              March 7, 2025

Regional Licensed Program Manager
Department of Corrections
1920 Technology Parkway
Mechanicsburg. PA. 17050

Re: SMU Program Deficiencies

To Whom This Letter May Concern:

In July of 2024, I had arrived here at SCI Fayette to be admitted to
the SMU program under the guise that I would receive incentives
and programming that would help me get released from prolonged
solitary confinement under disciplinary custody (DC) status. The
following details will explain to you, as to why im still in the
SMU program on Phase 5.

**1. Inadequate Housing And Treatment For My Mental Health Conditions:**

In December 2019, the conditions of my State sentence was for me to receive mental health treatment, while incarcerated, preferably at the forensic psychiatric unit At SCI Waymart. CP·51·CR·8348·2018. I have, however, been in solitary under DC status since January 2020. My MAX date is 8 months away on November 12, 2025. The SMU is nothing more than a normal RHU (i.e. same features, same restrictions, more sanctions on property). PSS Graft has established a routine practice of sticking her nose up to me and others, is dismissive, doesn't document symptoms, and goes out of her way to misuse her training to cause me psychological distress rather than to alleviate it.

**II. Official Oppression:**

On the 2pm-10pm shift, I am being subjected to various forms of official oppression by Lt. McShane, Sgt. Woodridge, and their officers. First, they are tampering with my dinner meals and Ramadan trays by allowing their worker to take portions of food out of trays and items out of my Ramadan bags. Second, im being verbally threatened and disrespected on a daily basis by them. Also, I have not been to the outside yard yet while here at SCI Fayette due to breakfast trays not providing me enough energy, and inmates constantly

·2·

throwing feces and urine. Moreover, despite policy prohibiting loud noise on the housing unit, inmates are allowed to yell at each other (younger inmates), while older inmates are deprived of their peace and quiet.

III. Hygeine:

I am a DC status inmate, but cannot order adequate hygeine items from commissary due to being Phase 5. I came here able to purchase hygeine items, and I should be able to continue purchasing them.

IV. Inadequate Supervision:

Lastly, the Superintendent, PRC, and all other Supervisors allow their subordinate officers to oppress us, assault us, and disrespect us, all of which violates the DOC Code of Ethics. There is no adequate supervision, as when we file grievances, inmate abuse reports, etc, they knowingly turn a blind eye and allow for their officers to keep doing what they do to us.

I request to be moved to SCI Phoenix and placed in long-term AC since im being released to that region. Thank You.

2.C. File                    .3.          Charles J Albert

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse
   so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
   or on the front if space permits.

1. Article Addressed to:

Regional Licensed Program Manager
Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA. 17050

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖

9590 9402 7131 1251 9694 70

2. Article Number (Transfer from service label)

7021 2720 0004 9126 9005

PS Form 3811, July 2020 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____    ☐ Agent
                      ☐ Addressee
B. Received by (Printed Name)    C. Date of Delivery
                                  5/10/25
D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
   (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted
   Delivery
☐ Signature Confirmation™
☐ Signature Confirmation
   Restricted Delivery

Domestic Return Receipt



Pennsylvania
**Department of Corrections**

**SUBJECT:**   Restricted Release Review

**TO:**   Charles Talert, QA4727

**FROM:**

Michael Zaken
Regional Deputy Secretary
Western Region

**Date:**   April 4, 2025

You are hereby informed that your placement on the Restricted Release
List (RRL) is under consideration, contingent upon an interview with the Regional
Deputy Secretary (RDS). DC-ADM 802, Attachment 1-B outlines the reason for
consideration.

Per policy, you may provide a written response to the Notice of Consideration
form for RRL placement within seven (7) calendar days of receiving the notice.
Responses will be reviewed as part of the hearing process, and added to the RRL
record.

Responses may be sent directly to the RDS at 1920 Technology Parkway,
Mechanicsburg, PA 17050, or submitted through the facility's PRC.

**CC:**   Superintendent Walker
File

Charles Talbert          Track No: 9590 9402 7131 1251 9695 24
No. QA4727
SCI Fayette
PO BOX 33028
St. Petersburg Fl. 33733          April 10, 2025

Michael Zaken
Regional Deputy Secretary
1920 Technology Pkwy.
Mechanicsburg PA. 17050

Re: Response To Notice Of Consideration Form
     For Restricted Release List Placement

Dear Mr. Zaken:
  Today, I was provided the notice from PRC at SCI Fayette,
which states, inter alia, that my placement on the RRL is
under consideration, contigent upon an interview with the
Regional Deputy Secretary. For the following reasons, I
should not be placed on the RRL, but transferred to
long-term Administrative Custody at SCI Phoenix.

1. First, RRL placement contravenes the conditions imposed on
my state sentence. I was to receive mental health treatment
for my personality difficulties that include poor impulse

control, poor judgment, and lack of insight into the underlying nature of my psychological conflicts and symptoms. The court had "recommended" for that treatment to be at SCI Waymart since that facility specializes in housing people with mental health disorders. Im currently prescribed Remeron and Paxil for these disorders. Also, there are POC records that reflect my "behavior" as being "psychotic" rather than "willful disobedience" where on January 5, 2020, I was placed into the POC at SCI Phoenix for "aggressive and erratic behavior" until my behavior stabilized the following day. However, this course did not continue, as I have been routinely punished with more and more DC time for these mental health episodes. Moreover, the length of DC sanction has made my condition worse, which is why I received so many written misconducts. I have attached the sentencing transcript, sentencing order, and POC placement/discharge form.

2. My max date is November 12, 2025. As such, I would be taking up space in RRL. Moreover, there is no way for me to complete the RRL program.

3. I have pending cases in Philadelphia. Long term AC at SCI Phoenix would allow me to stay out of trouble.

Thank you.

Yours Truly,

Charles Talbert

4-10-2025          2 of 2

R.C. File

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. Michael Zaken
Regional Deputy Secretary
Department of Corrections
1920 Technology PKwy.
Mechanicsburg, PA. 17050

9590 9402 7131 1251 9695 24

2. Article Number (Transfer from service label)

7020 0640 0000 2998 8564

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
15 April 25

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

APR 15 2025

USPS

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt



**pennsylvania**
DEPARTMENT OF CORRECTIONS

**TO**     Charles Talbert #QA4727
           SCI Fayette

**FROM**   MB Schaef
           Staff Assistant

**DATE**   April 29, 2025

**RE**     **Correspondence**

I am in receipt of your correspondence, addressed to RDS Zaken regarding your request to be transferred to SCI Phoenix on AC status instead of being placed on the Restricted Release List. Your correspondence has been forwarded to me for review and response.

Mr. Talbert, your letter has been received and will be part of your RRL hearing which is upcoming. You will be given the opportunity to address your concerns at the hearing. Transfers to specific institutions are not considered through inmate requests to the Department of Corrections Central Office.

I trust this addresses your concerns.


MZ/mbs

cc:   Superintendent Walker
      sutoth-2025-C45-000000091
      File



Pennsylvania
**Department of Corrections**

**SUBJECT:** Appeal Response for Placement on the Restricted Release List

**TO:** Charles Talbert, QA4727

**FROM:** Michael Wenerowicz ~ith. Winerog
Executive Deputy Secretary

**Date:** June 9, 2025

I have received your appeal letter regarding your placement on the Restricted Release List (RRL) and have reviewed your arguments concerning the appropriateness of this designation.

In your letter, you claim releasing you to society directly from RRL would heighten your risk of recidivism and you request that instead of being placed in the Intensive Management Unit (IMU) program that you remain at SCI Phoenix on long-term Administrative Custody status until your max date.

After a thorough examination of your case, it has been verified that the maximum date for your current state sentence is November 12, 2025. However, your record also shows that you have several detainers for charges associated with Robbery, Assault, Theft, Terroristic Threats, among others. Your placement on the RRL is consistent with the established departmental policy and your appeal regarding RRL placement is denied. The determination regarding placement in the IMU is not subject to appeal.

Your placement in the IMU was based on an evaluation of your ongoing behavioral issues and the likelihood of continued confinement in a secure facility due to your current detainers, with the understanding that you would benefit from the structure and support that the program provides.

The IMU is specifically designed to address the underlying thoughts and behaviors that led to restrictive housing placement and to equip participants with the tools needed to successfully reintegrate into the general population.

The department is responsible for maintaining the safety of both staff and inmates within the facility. I encourage you to consider giving the IMU program a fair chance.

**CC:** Superintendent Terra
File

### GENERAL APPROPRIATION ACT OF 2024 - ENACTMENT
#### Act of Jul. 11, 2024, P.L. , No. 1A                    Cl. 84
An Act

To provide appropriations from the General Fund for the expenses
of the Executive, Legislative and Judicial Departments of
the Commonwealth, the public debt and the public schools for
the fiscal year July 1, 2024, to June 30, 2025, and for the
payment of bills incurred and remaining unpaid at the close
of the fiscal year ending June 30, 2024; to provide
appropriations from special funds and accounts to the
Executive and Judicial Departments for the fiscal year July
1, 2024, to June 30, 2025, and for the payment of bills
remaining unpaid at the close of the fiscal year ending June
30, 2024; to provide for the appropriation of Federal funds
to the Executive and Judicial Departments for the fiscal
year July 1, 2024, to June 30, 2025, and for the payment of
bills remaining unpaid at the close of the fiscal year ending
June 30, 2024; and to provide for the additional
appropriation of Federal and State funds to the Executive
and Legislative Departments for the fiscal year July 1, 2023,
to June 30, 2024, and for the payment of bills incurred and
remaining unpaid at the close of the fiscal year ending June
30, 2023.

### TABLE OF CONTENTS

#### PART I.    GENERAL PROVISIONS

Section 101.  Short title.
Section 102.  Definitions.
Section 103.  Abbreviations.
Section 104.  State appropriations.
Section 105.  Federal appropriations.
Section 106.  References to Department of Criminal Justice.

#### PART II.    GENERAL FUND APPROPRIATIONS
#### FOR CURRENT FISCAL YEAR

#### SUBPART A.    EXECUTIVE DEPARTMENT

Section 201.  Governor.
Section 202.  Executive Offices.
Section 203.  Lieutenant Governor.
Section 204.  Attorney General.
Section 205.  Auditor General.
Section 206.  Treasury Department.
Section 207.  Department of Aging.
Section 208.  Department of Agriculture.
Section 209.  Department of Community and Economic Development.
Section 210.  (Reserved).
Section 211.  Department of Conservation and Natural Resources.
Section 212.  Department of Corrections.
Section 213.  (Reserved).
Section 214.  Department of Drug and Alcohol Programs.
Section 215.  Department of Education.
Section 216.  State System of Higher Education.
Section 217.  Thaddeus Stevens College of Technology.
Section 218.  Pennsylvania Higher Education Assistance Agency.
Section 219.  Department of Environmental Protection.
Section 220.  Department of General Services.
Section 221.  Department of Health.

```
        State appropriation.......                         900,000
    For payment of annual fixed
charges in lieu of taxes to
counties and townships on land
acquired for water conservation
and flood control.
        State appropriation.......                          70,000
    For payment of annual fixed
charges in lieu of taxes to
political subdivisions for school
districts on lands acquired by
the Commonwealth for Project 70.
        State appropriation.......                          88,000
    For payment of annual fixed
charges in lieu of taxes to
counties, school districts and
townships on forest lands.
        State appropriation.......                       7,962,000
    For payment of annual fixed
charges in lieu of taxes to
counties, school districts and
local municipalities on State
park lands.
        State appropriation.......                         415,000
Section 212.  Department of Corrections.
    The following amounts are
appropriated from the General
Fund to the Department of
Corrections for the current
fiscal year:                             Federal          State
    For general government
operations of the Department of
Corrections.
        State appropriation.......                      40,735,000
    For medical care.
        State appropriation.......                     410,408,000
    For correctional education and
training.
        State appropriation.......                      50,871,000
    The following Federal amounts
are appropriated to supplement
the sum appropriated for
correctional education and
training:
    (1)  "Correctional Education.".
        Federal appropriation.....     832,000
    For the State correctional
institutions.
        State appropriation.......                   2,439,267,000
    The following Federal amounts
are appropriated to supplement
the sum appropriated for the
State correctional institutions:
    (1)  "Reimbursement for
Incarcerated Aliens."
        Federal appropriation.....   2,500,000
    (2)  "Criminal Justice and
Mental Health Collaboration."
        Federal appropriation.....     550,000
    (3)  "Naloxone Reentry
Tracking Program."
        Federal appropriation.....     200,000
```

```
    (4)  "Second Chance Act."
        Federal appropriation.....         31,000
    (5)  "Adult Reentry Education,
Employment and Treatment."
        Federal appropriation.....        600,000
    (6)  "Pay for Success."
        Federal appropriation.....        900,000
    (7)  "PREA Program: Strategic
Support for PREA Implementation."
        Federal appropriation.....        179,000
    For State field supervision.
        State appropriation.......                    184,210,000
    The following Federal amounts
are appropriated to supplement
the sum appropriated for the
State field supervision:
    (1)  "Smart Supervision."
        Federal appropriation.....        800,000
    For Pennsylvania Parole Board.
        State appropriation.......                     13,373,000
    For the Sexual Offenders
Assessment Board.
        State appropriation.......                      8,031,000
    For the Board of Pardons.
        State appropriation.......                      2,880,000
    For Office of Victim Advocate.
        State appropriation.......                      3,809,000
Section 213.  (Reserved).
Section 214.  Department of Drug and Alcohol Programs.
    The following amounts are
appropriated from the General
Fund to the Department of Drug
and Alcohol Programs for the
current fiscal year:              Federal          State
    For general government
operations of the Department of
Drug and Alcohol Programs.
        State appropriation.......                      3,501,000
    The following Federal amounts
are appropriated to supplement
the sum appropriated for general
government operations:
    (1)  "SUPTRSBG -
Administration and Operation."
        Federal appropriation.....      9,733,000
    (2)  "Substance Use Special
Projects - Administration and
Operation."
        Federal appropriation.....      3,885,000
    (3)  "State Opioid Response
Administration."
        Federal appropriation.....      9,104,000
    For assistance to drug and
alcohol programs.
        State appropriation.......                     44,732,000
    The following Federal amounts
are appropriated to supplement
the sum appropriated for
assistance to drug and alcohol
programs:
    (1)  "SUPTRSBG - Drug and
Alcohol Services."
```